IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

STEVEN A. McLELLAN,
     Plaintiff,

vs.                         Case No. 3:05cv325/MCR/EMT

JO ANNE B. BARNHART,
Commissioner of the
Social Security Administration,
     Defendant.
_____/

## REPORT AND RECOMMENDATION

     This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act (Act) and related statutes, 42 U.S.C. § 401, *et seq.* It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits (DIB) under Title II of the Act.

     Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.     PROCEDURAL HISTORY

     This suit involves an application for disability benefits made under Title II of the Act (Tr. 121-23).[1] Plaintiff's application was denied initially (Tr. 86A-86C) and on reconsideration (Tr. 86F-86I). On April 21, 2003, following a hearing, an administrative law judge (ALJ) rendered a decision

_____

[1] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on November 1, 2005 (Doc. 5).

in which he found that Plaintiff was disabled as defined in the Act (Tr. 82-86). On June 13, 2003, the Appeals Council of the Social Security Administration, on its own motion, reviewed the decision and remanded the case for further proceedings (Tr. 91-94). On March 25, 2005, a different ALJ rendered a decision in which he found that Plaintiff was not under a "disability" as defined in the Act (Tr. 16-48). On July 22, 2005, the Appeals Council denied Plaintiff's request for review (Tr. 5-8). The Appeals Council's action made the ALJ's decision the final decision of the Commissioner and, therefore, subject to review in this court. Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998). Plaintiff's appeal from the final decision of the Commissioner is now before this court.

II.    FINDINGS OF THE ALJ

On March 25, 2005, the ALJ made several findings relative to the issues raised in this appeal (Tr. 16-48). The ALJ found that:

1)    The period of adjudication is from November 30, 2000, the amended alleged disability onset date, through March 31, 2002, the date Plaintiff last met the special insured status requirements for DIB. An unfavorable decision was issued at Step 4 of the sequential evaluation process (i.e., Plaintiff's impairments do not prevent him from performing his past relevant work).[2]

2)    Plaintiff has not engaged in substantial gainful activity since his alleged onset.

3)    Plaintiff had the following "severe" medically-determinable impairments during the period of adjudication:  status post repair of the left shoulder with subsequent possible tendonopathy or possible partial tear of the supraspinatus tendon, depression versus adjustment disorder, and probable borderline intellectual functioning (I.Q. scores ranging from 75-83).

4)    Plaintiff also alleged, or the ALJ independently considered, head injury, neck pain, back pain, status post hernia repair in the remote past, and left knee injury as possible "severe" conditions, but they were not found to entail significant work-related limitations of record resulting from medically-determinable impairments for a continuous period of 12 months during the period of adjudication.

5)    No single medically-determinable impairment, or combination thereof, had the specific or equivalent severity of medical findings necessary to establish presumptive disability under the evaluative standards found in Appendix 1 of the Regulations.

---

[2]The sequential evaluation process is described more fully below.

6)    Plaintiff's testimony of subjective complaints and functional limitations, where inconsistent with the residual functional capacity (RFC) of the ALJ's decision, was not supported by the evidence as a whole in the disabling degree alleged and, therefore, lacked credibility.

7)    Plaintiff retained the physical RFC for a wide range of light work with no limitations with regard to sitting, standing or walking, no restrictions in the ability to manipulate objects, and no restrictions regarding the use of the right upper dominant extremity. However, Plaintiff was restricted to lifting no more than 15-20 pounds using the left upper extremity on an occasional or frequent basis, bilateral lifting of not greater than 20 pounds, no prolonged overhead pushing/pulling with the left upper extremity, no repetitive overhead lifting, no repetitive pushing/pulling, only "occasional" climbing, and "frequent" performance of activities that involve balancing, kneeling, crouching, crawling, and stooping.

8)    Plaintiff retained the mental RFC for the performance of at least unskilled work tasks to accommodate the effects of any mental or emotional impairment.

9)    To the extent alcohol or substance abuse/addiction, if any, was a part of the claimant's medical history pertaining to the period of adjudication, the effects of such were not considered in the determination of his RFC.

10)    Plaintiff remained capable of performing categories of his past relevant work, specifically those of porter in an auto body shop and food delivery person, during any consecutive 12-month period of time from November 30, 2000 through March 31, 2002, the period of adjudication.

11)    Plaintiff was not under a "disability," as defined in the Act, at any time prior to or on the date last insured, March 31, 2002.

## III.   STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) (stating "[t]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied"); *see also* Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987); Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with

or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance, i.e., "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps. The steps are:

1.     If the claimant is performing substantial gainful activity, he is not disabled.

2.     If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.     If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve

months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY

A.    Personal History

Plaintiff testified at a hearing before an ALJ on October 9, 2003, as follows (Tr. 369-97). Plaintiff's date of birth is January 23, 1954, making him 49 years old at the time of the hearing (Tr. 373). Plaintiff completed high school and also obtained a certification in welding technology from Pensacola Junior College (id.).

Plaintiff last worked in early November 2000 (id.). At that time, he was employed in a metal-working shop "doing some machining and welding" (Tr. 374). Plaintiff quit after approximately three months because the job was "too demanding" (id.). He had difficulty lifting and standing and was required to perform technical duties for which he had insufficient training (id.). Prior to that job, Plaintiff worked as a metalworker for approximately ten years, primarily doing sheet metal fabrication (Tr. 374-75). Plaintiff was required to lift objects that weighed one hundred pounds or more, and he was required to sit, stand, bend, and stoop (Tr. 375). In the previous fifteen years, Plaintiff also worked offshore on a supply vessel, which required lifting forty

to fifty pound ropes (Tr. 375-76).  Additionally, Plaintiff worked as a carpenter's helper forming concrete (Tr. 376).

According to Plaintiff, his physical problems that prevent him from working are his left shoulder, a hernia and cyst removed from his abdomen, and his left knee (Tr. 377).  Plaintiff had surgery on his left shoulder in 1997, had hernia surgery performed when he was in the fifth grade, and has had no treatment for his left knee (Tr. 389-91).  Plaintiff took Lortab in the past for pain, but did not have a current prescription at the time of his hearing (Tr. 393-94).

The most Plaintiff can lift and carry is ten to fifteen pounds (Tr. 377-78).  He can work with his arms above his head for only a short period of time before his left shoulder "gives out" (Tr. 378).  Additionally, Plaintiff can only stand five to ten minutes at a time before his left side "gives out," and he can only walk two hundred yards before he has pain and his left knee buckles (Tr. 380-81).  Plaintiff can sit comfortably for only fifteen minutes (Tr. 382).  He has trouble bending and squatting (Tr. 382).  Overall, he has little stamina or energy (Tr. 378).

Plaintiff also has depression, which he states began about two and a half years before his hearing (Tr. 379).  His appetite has been affected, and he has lost ten to fifteen pounds (Tr. 385).  He also has problems with being worried and stressed, and he avoids people (*id.*)

On an average day Plaintiff gets up at nine, has a cup of coffee or some breakfast, and walks around (Tr. 383).  He is able to cook meals and do household chores, such as cleaning, washing dishes, and doing the laundry (*id.*).  Plaintiff is more careful when doing chores than he was before his physical problems began (*id.*).  He is able to drive and has no problems grocery shopping (*id.*).  He feeds his dog and cat and watches television (Tr. 387).

Plaintiff testified at a supplemental hearing before an ALJ on July 2, 2004, as follows (Tr. 332-68).  He generally described the additional medical treatment he received since his last hearing (Tr. 336-38).  He also described abdominal pain that prevents him from working and explained that this was the only real change in his physical condition since his last hearing (Tr. 339-41).  However, Plaintiff stated that his depression had worsened and he is not sleeping well "at all" (Tr. 341-42).

B.     Relevant Medical History

1.     Records from John F. Todd, M.D., and West Florida Regional Medical Center (West Florida)

Plaintiff initially sought treatment for his left shoulder after injuring himself on the job (Tr. 209). After physical therapy and conservative treatment failed, Dr. Todd recommended surgery (Tr. 208). Thus, Plaintiff was admitted to West Florida on December 11, 1997, with a diagnosis of recurrent anterior instability, left shoulder, with probable glenoid labrum tear (Tr. 189-97). He underwent diagnostic arthroscopy with arthroscopic repair of the glenoid labrum, as well as arthroscopic subacromial bursectomy with resection of the coracoacromial ligament (Tr. 191-93). Plaintiff had no apparent postoperative complications and was discharged the following day (Tr. 189-90). Eight days later, Plaintiff was found to be neurovascularly intact, was "healing well," and had good hand, wrist and elbow range of motion (Tr. 204). It was determined that Plaintiff could return to work at that time in an extremely limited capacity, as long as Plaintiff did not use his left arm and kept it immobilized (*id.*).

Plaintiff was seen by Dr. Todd for follow up on February 16, 1998 (Tr. 203). Plaintiff was released to work with the following restrictions: no repetitive overhead lifting, no lifting greater than five pounds, and light gripping and grasping only (Tr. 203). A subsequent treatment note dated March 17, 1998, reveals that Plaintiff had developed postoperative adhesive capsulitis (Tr. 202). Active forward elevation at that time was to 110 degrees, and passive forward elevation was to 140 degrees (*id.*). Plaintiff had good grip strength, but was weak in forward elevation and external rotation, but Dr. Todd noted that this was to be expected (*id.*). Because Plaintiff had re-injured his shoulder in a fall three weeks prior, Dr. Todd noted that he would postpone manipulation, but he returned Plaintiff to therapy for a program of capsular stretch (*id.*).

On April 27, 1998, Plaintiff reported that he had been working hard in therapy, and motion had improved and pain had decreased (Tr. 201). Active forward elevation was to 140 degrees, passive forward elevation was to 165 degrees, passive external rotation was neutral to 50 degrees, and functional internal rotation was to the level of his belt posteriorly (*id.*). Dr. Todd characterized Plaintiff as "doing much better," and he advised that Plaintiff could resume work with the following restrictions: no repetitive overhead lifting, no lifting greater than fifteen pounds, and no repetitive pushing or pulling (*id.*).

Dr. Todd rated Plaintiff as having reached maximum medical improvement (MMI) on June 17, 1998, and assigned an impairment rating of 4 percent for the total body (Tr. 200). Plaintiff

returned on August 4, 1999, reporting that he was doing "fairly well" but had re-injured his left shoulder with his arm in an elevated overhead position (Tr. 199). He denied any new numbness and tingling, but complained of increased weakness and pain, particularly with overhead activities (*id.*). On examination, active forward elevation in the scapular plane was to 165 degrees, passive external rotation was neutral to 35 degrees, and passive external rotation abduction was painful (*id.*). Plaintiff  was tender in the anterior lateral aspect of his shoulder region, in the region of the subdeltoid bursa, and in the subcoracoid region, as well as the bicipital groove, and he had positive Neers impingement sign, primarily in the abducted position (*id.*). He had good grip strength (*id.*). He was injected with a solution of Marcaine, Lidocaine, and Celestone in the subacromial space and was instructed to undergo a course of physical therapy (*id.*).

Plaintiff reported to Dr. Todd on September 17, 1999, that his pain had not improved, but his range of motion and strength had improved (Tr. 198). Examination showed active forward elevation to 180 degrees and passive external rotation neutral to 15 degrees (*id.*). Strength testing was improved, with strength graded at 4+ to 5/5 (*id.*). Plaintiff was assessed with a rotator cuff strain of the left shoulder, and he was directed "to continue with his therapy until it is complete" (*id.*). Dr. Todd planned to see Plaintiff on an "as needed" basis (*id.*).

2. Veteran's Administration (VA) Records

Records from the VA Medical Center in Biloxi, Mississippi, reveal that Plaintiff was seen by Henry A. Foscue, M.D., at the Pensacola Outpatient Clinic on May 11, 2000, complaining of pain in his right[3] shoulder and knee that he described as "sharp" (Tr. 233-34). Plaintiff reported that he had experienced the pain for two months, but he described it as an "old injury" and indicated that he was "lifting an object and pulled something" (*id.*). Plaintiff rated the severity of his pain at a seven and stated that movement made the pain worse, and nothing made it better (Tr. 234). He asserted that the pain affected his activity, sleep, appetite, mood, and energy (Tr. 233). No treatment was documented.

---

[3]Although Dr. Foscue documented that Plaintiff complained of right shoulder and knee pain, a review of other medical records makes it apparent that he intended to refer to left shoulder and knee pain.

When Plaintiff next saw Dr. Foscue on July 12, 2000, he indicated that he was having pain in his left shoulder that would come and go (Tr. 231). He described the pain as "sharp" and feeling "like a pinched nerve" (*id.*). He rated the severity of his pain at a four, and he reported that "NSAIDs" did not seem to help much (Tr. 229). Examination of Plaintiff's extremities revealed no clubbing, cyanosis, or edema, and the left shoulder was normal to palpation and non-tender (Tr. 230). However, passive abduction was limited to 80 percent by pain (*id.*).

X-rays of Plaintiff's shoulder taken on July 19, 2000, revealed three anchors in the superior left glenoid region, indicating shoulder repair but no arthritic changes (Tr. 244). It was the radiologist's impression that there was only a "minor abnormality" (*id.*) An MRI of the left shoulder performed on August 28, 2000, showed normal bone alignment in the shoulder with no definite subluxation or dislocation identified (Tr. 241). Plaintiff had no significant joint effusion, with only a trace amount of fluid within the joint (*id.*). The infraspinatus and subscapularis tendons were intact, with increased signal within the mid-portion of the supraspinatus tendon, most suggestive of tendinopathy or perhaps a partial tear (*id.*). No definite impingement was identified with the acromial process (*id.*).

Plaintiff was apparently not seen again by Dr. Foscue until August 23, 2001, at which time he reported soreness and discomfort to the right side of his throat, present for more than two months, and regurgitation about two times a week for the last year (Tr. 226). He described "vague" voice change (*id.*). At 167 pounds, it was noted that Plaintiff's weight was up 22 pounds from over one year ago (*id.*). Plaintiff also described being very fatigued and depressed for four to six months, which alternated with periods of feeling "extra good" and energetic for a week at a time (*id.*). Plaintiff also indicated that he was having difficulty sleeping (*id.*). He denied ever being treated for depression and stated that he had never felt that way before (*id.*). Plaintiff reported that he was taking Lortab prescribed by his primary medical doctor, but stated that the doctor was no longer in town (Tr. 227). He rated the severity of his pain at a six (*id.*). Plaintiff's neck was normal to palpation, except for mild tenderness on the right (Tr. 226). He was started on a trial of Prevacid and referred for an ear, nose and throat (ENT) consultation, as well as a mental health consultation, and he was to return to the clinic in six months (*id.*).

Plaintiff was seen at the VA mental health clinic on August 29, 2001, by Maxine C. Marretta, A.R.N.P. (Tr. 224-25).  His affect was somewhat flat, and Plaintiff described his mood as depressed (Tr. 225).  He admitted to fleeting thoughts of suicide, but indicated that they were not frequent and that he had no plan (*id.*).  He denied hallucinations (*id.*).  The nurse practitioner observed that Plaintiff fidgeted and seemed anxious (*id.*).  She noted that Plaintiff's memory, both recent and remote, seemed intact (*id.*).  Plaintiff reported that he had trouble sleeping, but then told the examiner that he slept fourteen hours at a time (*id.*).  He stated he had lost interest in fishing, he isolated himself and did not go out with his friends, and his appetite was decreased (*id.*).  He further stated that he was not keeping his house clean and that his relatives contributed to his support (*id.*).  Ms. Marretta assessed Plaintiff with depression, NOS, and documented a Global Assessment of Functioning (GAF) of 50[4] (Tr. 224).  Plaintiff was prescribed Celexa and Trazodone (*id.*).

When Plaintiff returned to see Ms. Marretta on October 16, 2001, he reported that he could not tell much of a difference on the medication (Tr. 224).  However, he stated that he was going out more with friends, isolating less, and not sleeping as much (*id.*).  He indicated that financial concerns were one of his main issues (*id.*).  Plaintiff reported that he had "so many wrecks on motorcycles that he [could not] work construction anymore" (*id.*).  He was observed to have a slightly flat affect, and Ms. Marretta noted that he seemed to need to have some things repeated before he grasped the idea (Tr. 224).  She planned to increase his Celexa to 40 mg and referred him to the Department of Veterans Affairs for information regarding the possibility of financial aid or help with school to retrain for a different job (*id.*).

Although it was noted that Plaintiff was to return to the mental health clinic in late December 2001, he did not return (Tr. 224).  The next record from the VA reflects that Plaintiff saw Dr. Foscue on February 22, 2002 (Tr. 222-24).  It was noted that Plaintiff never scheduled an ENT appointment, but he reported that the problem had cleared up (Tr. 222).  Plaintiff made no mention of his mental health problems to Dr. Foscue (*see* Tr. 221-23).  Instead, Plaintiff complained of an increase in left

---

[4]Global assessment of functioning is the overall level at which an individual functions including social, occupational, academic, and other areas of personal performance.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30-32 (4th ed. 1994).  It may be expressed as a numerical score.  *Id.* at 32.  A score between 41 and 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id.*

knee pain over a one-year period and reported a prior injury in the 1970's (*id.*).  He related that his knee did not swell, but he stated that it locked in extended position during the night (*id.*).  He maintained that he was still having trouble with his left shoulder, but indicated that neither his shoulder nor his knee concerned him at that time (*id.*).  Plaintiff's chief complaint was intermittent left lower quadrant abdominal pain for five to six months, and he reported that he had hernia surgery in the left groin area when he was seven years old (*id.*).  He stated that the pain radiated into the left low back area and was aggravated by walking and bending and somewhat relieved by lying down (*id.*).  He rated the severity of his pain at a five (Tr. 223).

On examination, Plaintiff's weight was 163 pounds (Tr. 222).  Examination of the neck was normal to palpation, and examination of the back revealed no tenderness and no "spine step off," while examination of the abdomen revealed consistent moderate left lower quadrant tenderness (*id.*).  X-rays of the lumbar spine revealed no abnormalities (Tr. 239).  Dr. Foscue assessed Plaintiff with left lower quadrant abdominal pain, and a CT of the abdomen was planned (Tr. 222).

Plaintiff returned to the clinic on March 29, 2002, complaining of intermittent sharp pain in the left groin area radiating to the left lower back for approximately nine months (Tr. 299).  Plaintiff rated the severity of his pain at a seven (Tr. 298).  His weight was recorded at 163.4 pounds (*id.*).  Plaintiff was assessed with left lower quadrant pain with known undescended left testicle (*id.*).  It was noted that the CT scan had not been scheduled, but an effort would be made to schedule it (*id.*).

Plaintiff returned to the clinic on April 19, 2002, complaining of increasing left lower quadrant pain and tenderness (Tr. 320).  A CT scan of the abdomen showed minimal hepatomegaly, but otherwise was normal (*id.*).

Plaintiff was apparently not seen again at the VA clinic again until October 17, 2003, at which time he requested a consultation with the mental health clinic for recurrent "bouts of depression" (Tr. 308).  Plaintiff complained that he had fluid draining from his ears for approximately one-and-a-half months (Tr. 309).  Plaintiff further complained that he had "lots of pain" in his left lower quadrant that radiated down the left front of his thigh, as far as his knee (*id.*).  He rated the severity of his pain at a five and characterized a "tolerable" level of pain as being a three (Tr. 310).  It was noted that a mood/depression screening test was positive, with Plaintiff reporting the following symptomatology: weight gain or loss, insomnia or hypersomnia, diminished

energy, diminished libido, worthlessness, diminished concentration, and preoccupation with death (*id.*).

Dr. Foscue noted that Plaintiff had improved after treatment for depression in 2001-2002, and he indicated that Plaintiff still had periods of feeling "extra good" and energetic for a few days at a time (Tr. 309).  With regard to his complaints of abdominal pain, Plaintiff reported the pain had been intermittent for three to four years, but had worsened during the past six months and was worse with walking (*id.*).  Plaintiff indicated that he felt it might be related to an unsuccessful surgical attempt as a child to correct an undescended left testicle (*id.*).  He "localize[d]" the pain to just above the old surgical scar (*id.*).

Physical examination revealed that Plaintiff weighed 156.6 pounds (Tr. 309).  His abdomen had normal bowel sounds and there was no mass or organomegaly (*id.*)  He had poorly reproducible left lower quadrant tenderness to deep palpation (*id.*).  Examination of the back revealed no spine tenderness or step-off, as well as no tenderness over the buttocks or paravertebral muscle spasm (*id.*).  Plaintiff's right hip range of motion and straight leg raise on the right were normal, while Plaintiff reportedly had left lower back pain with straight leg raise to 30 degrees and with full left hip flexion, but not with hip rotation (*id.*).  Plaintiff had yellow discharge from his ears, and his tympanic membranes were obscured (*id.*).  It was Dr. Foscue's impression that Plaintiff had depression, probable bipolar disorder; external otitis; and left lower quadrant pain (*id.*).  He prescribed Corticosporin and placed Plaintiff on a trial of Salsalate (*id.*).

C.      Other Information Within Plaintiff's Claim File

Mary Elizabeth Seay, M.D., completed a physical RFC Assessment on November 20, 2001 (Tr. 212-19).  According to Dr. Seay, Plaintiff was able to lift and/or carry twenty pounds occasionally and ten pounds frequently, and he could sit, stand, or walk about six hours in an eight-hour workday (Tr. 213).  His ability to push/pull was unlimited in the lower extremities, but was limited in the upper extremities to the extent that Plaintiff should limit repetitive motion involving the left shoulder (*id.*).  Plaintiff was frequently able to balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, and occasionally able to climb ladders, ropes or scaffolds (Tr. 214).  Plaintiff was limited in his ability to reach overhead in all directions, but unlimited in his ability to feel and

perform fine and/or gross manipulation (Tr. 215).  No visual, communicative, or environmental limitations were established (Tr. 215-16).

Tom C. Peele, M.D., completed a physical RFC Assessment on March 20, 2002 (Tr. 245-52).  According to Dr. Peele, Plaintiff was able to lift and/or carry twenty pounds occasionally and ten pounds frequently, and he could sit, stand, or walk about six hours in an eight-hour workday (Tr. 246).  His ability to push/pull was limited in the upper left extremity (*id.*).  Plaintiff was frequently able to climb ramps and stairs, but was never able to climb ladders, ropes or scaffolds (Tr. 247).  No manipulative, visual, communicative, or environmental limitations were established, other than a limited ability to reach in all directions due to left shoulder pain (Tr. 248-49).

On March 21, 2002, Jane F. Cormier, Ph.D., completed a Psychiatric Review Technique form (Tr. 253-66).  She found that there was no evidence of a mental impairment or any allegation of a mental impairment prior to Plaintiff's date last insured (DLI)[5] (Tr. 253, 265).  She further noted that Plaintiff had no history of any type of psychological treatment on or before his DLI (Tr. 265).

On March 29, 2002, Plaintiff underwent a Compensation and Pension examination by Cynthia Javellana, M.D., for evaluation of a mental disorder (Tr. 305).  Dr. Javellana noted that Plaintiff was able to give some background information, but she observed that he was somewhat vague and became easily confused with his information (*id.*).  Plaintiff reported that he was in the United States Air Force from 1974 until January 1980 (*id.*).  He stated that he began having mental anguish and stress at the end of an overseas tour (*id.*).  According to Plaintiff, he just "felt down" and depressed and had low energy (*id.*).  He related that he started getting better after returning to the United States (*id.*).  Plaintiff stated that again began having problems with depression in the past year (*id.*).  Dr. Javellana noted that Plaintiff reported he had many problems, but he was somewhat vague and nonspecific (*id.*).  Plaintiff stated that the boat he had been living on sunk, along with all of his belongings, and he had "just been stressed out" since then (*id.*).  Plaintiff reported that he had been taking Celexa and Trazodone "on and off" but felt it was ineffective (*id.*).  He also reported that

---

[5]Although Dr. Cormier indicated that Plaintiff's DLI was "3/01" (Tr. 253, 265), his DLI was actually March 31, 2002 (*see* Tr. 46).  The record reflects that Plaintiff initially reported mental health problems during a visit with Dr. Foscue in August 2001, prior to his DLI (Tr. 226).  Thus, the opinion of Dr. Cormier will not be considered by this court.

he had low energy, no interest in anything, and "just [felt] down" (*id.*).  Plaintiff indicated that he had lost some weight and had problems with his appetite (*id.*).  He maintained that he stayed withdrawn and isolated (*id.*).

On mental status examination, Plaintiff was observed to be casually dressed but poorly groomed and disheveled (Tr. 306).  Plaintiff was reported to be six feet tall and approximately 155 pounds, and he looked older than his stated age (*id.*).  He was alert and oriented; however, his speech was slow and hesitant, and his affect was very flat and blunted (*id.*).  Dr. Javellana noted that Plaintiff sighed frequently and kept repeating a question before he could answer it (*id.*).  He denied any acute psychotic symptoms, but Dr. Javellana indicated that he tended to be illogical at times (*id.*).  Plaintiff admitted to feeling anxious, depressed, and stressed out, but he denied suicidal ideations or intent (*id.*).  He described himself as feeling that he was a "failure" (*id.*).  Dr. Javellana reported that Plaintiff's cognitive functions were diminished, his short-term memory was decreased, his concentration and attention span were decreased, and his insight and judgment were limited (*id.*).  She assessed Plaintiff with depressive disorder, NOS, rule out major depression, mild, recurrent, with no psychotic symptoms; alcohol abuse, rule out dependence; and mood disorder, secondary to multiple medical problems (Tr. 306-07).  She opined that Plaintiff's GAF was in the 50 to 55[6] range (Tr. 307).

On April 10, 2002, a Compensation and Pension examination was performed by Marshall Fletcher, P.A., in connection with Plaintiff's claim for a non-service-connected pension based on his left knee (Tr. 302-05).  It was noted that, although Plaintiff sustained some shoulder damage and had rotator cuff surgery, his shoulder worked fairly well and was "not a disabling factor" (Tr. 302).  Plaintiff reported that he left his job as a machinist two years earlier due to knee pain (*id.*).  On physical examination, Plaintiff was 71 inches tall and weighed 160 pounds (Tr. 303).  It was noted that there had been no significant weight change over a one-year period (*id.*).  Plaintiff was observed to walk with a limp, favoring the left side (*id.*).  Plaintiff's left shoulder showed a range of motion

---

[6]A GAF of 51 to 60 represents moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 30-32 (4th ed. 1994).

of flexion to extension to 180 degrees, had good abduction to 180 degrees, and had negative impingement sign (Tr. 304). No neurological deficits were present in the upper extremity (*id.*). On examination of the knee, Plaintiff had flexion and extension to 140 degrees and no lateral instability (*id.*). Some "slight" palpable tenderness existed along the lateral aspect of the knee, but no inflammation or swelling was present (*id.*). Plaintiff was assessed with left shoulder rotator cuff tear with surgical repair that "basically [was] able to function fairly well" and a "left knee condition" (*id.*). An addendum to the report indicated that an x-ray of the knee was basically normal (*id.*). The physician's assistant concluded that Plaintiff would not qualify for a non-service connected pension until "at least" his knee was evaluated by orthopedics to determine whether it could be surgically repaired or if he even had a significant problem (Tr. 304-05).

On April 23, 2002, the VA issued a "rating decision" in which Plaintiff was found to be "permanently and totally disabled for non-service connected pension purposes," with an effective date of October 16, 2001 (Tr. 282). The opinion was based on VA records from August 23, 2001 to February 22, 2002 (reflecting depression and pain), and VA examinations dated March 29, 2002 and April 10, 2002 (diagnosing depression and status post surgical repair of a left shoulder rotator cuff) (Tr. 281-82).

Plaintiff underwent a consultative psychological evaluation on January 14, 2003, conducted by Mark D. Moreland, Psy.D. (Tr. 267-70). Dr. Moreland observed that Plaintiff's gait and posture were normal and that Plaintiff made no involuntary movements (Tr. 267). Plaintiff's speech and behavior were normal, his eye contact was fair, and his attitude was characterized as "guarded" (*id.*). Plaintiff complained of symptoms of depression and anxiety during the past two-and-a-half years (*id.*). Plaintiff "endorsed" the following symptoms from a checklist: insomnia, low energy, restlessness, sadness, and weight change, as well as feeling fearful, nervous, uptight, and the need to do things perfectly (*id.*). He attributed his depression and anxiety to the loss of his boat, which sank, and the resulting loss of all his possessions (*id.*). He related that the boat was not insured and that after it sank he became depressed (*id.*). He denied taking prescription medications at that time (Tr. 268). Plaintiff stated that he has been charged with DUI four or five times since 1976, most recently in September 2002, and that he was scheduled for court and might lose his license (*id.*). He stated that he started drinking at the age of fourteen and has attended DUI school on two

occasions, but he denied participating in any other type of alcohol treatment (*id.*).  He also stated that he has no other emotional problems (*id.*).  He maintained that he was "cutting back" on his alcohol consumption and asserted that his intake "varie[d] from time to time and mood to mood" (*id.*).  Plaintiff reported multiple accidents in which he had been knocked unconscious (*id.*).  Upon administration of the Wechsler Adult Intelligence Scale-III (WAIS-III), Plaintiff attained a verbal IQ score of 83, a performance IQ score of 75, and a full scale IQ of 77, placing him in the borderline range of intellectual functioning (Tr. 269).

Plaintiff's thought processes were logical, with no evidence of perceptual abnormalities, and he appeared oriented to person, place, and time (*id.*).  Plaintiff's thought content was positive for depression and anxiety, and his mood was depressed and his affect blunted throughout the evaluation (*id.*).  Although Plaintiff reported a history of head injuries, Dr. Moreland opined that there was no evidence they had caused any significant permanent damage to his cognitive abilities (*id.*).  Plaintiff's insight and overall judgment both appeared to be poor (*id.*).  With regard to daily functioning, Plaintiff related that he did light housework, but could not bend over or lift any heavy objects (*id.*).  He indicated that he socialized very little, primarily with his girlfriend (*id.*).

Dr. Moreland noted that despite Plaintiff's emotional concerns, Plaintiff's concentration, persistence, and pace appeared normal; thus, he would have no difficulty completing tasks timely and appropriately (*id.*).  Plaintiff appeared to have the ability to tolerate the mental demands of a work environment and appeared capable of motivating himself in daily activities (*id.*).  Plaintiff was able to direct his activities in a reasonable and effective manner without any special support, and he was able to sustain his efforts over time to achieve long-term goals (*id.*).  Plaintiff appeared able to follow simple instructions and capable of interacting in a meaningful manner with others (Tr. 270).  Plaintiff displayed no evidence of concentration problems and did not appear to have difficulty withstanding the emotional stress of a routine workday (*id.*).

Dr. Moreland concluded that Plaintiff merited diagnoses of adjustment disorder and alcohol dependence (*id.*).  He noted that Plaintiff's limited intellectual ability was consistent with a diagnosis of borderline intellectual functioning (*id.*).  Additionally, he noted that Plaintiff's guarded presentation, his history of living on the periphery of society, and his apparent thrill-seeking and somewhat self-destructive lifestyle were all consistent with antisocial character traits (*id.*).  Dr.

Moreland observed that Plaintiff displayed no motivation to make any changes in his life and, therefore, warranted a "poor" prognosis (*id.*). However, he indicated that Plaintiff did not appear to have any problems that would significantly prevent him from managing his own benefits (*id.*).

On January 4, 2003, Dr. Moreland completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) (Tr. 271-72). Dr. Moreland indicated that Plaintiff's impairments would not affect his ability to understand, remember, and carry out instructions or his ability to respond appropriately to supervision, co-workers, and work pressures in a work setting (*id.*). In addition, he concluded that there were no other capabilities affected by his impairment (Tr. 272).

Plaintiff underwent a consultative orthopedic evaluation by C.W. Koulisis, M.D., on January 22, 2003 (Tr. 273-76). Plaintiff's chief complaint was left shoulder pain (Tr. 273). Plaintiff also complained of nonspecific neck, low back, and left knee pain (*id.*). He denied any upper or lower extremity radicular component, long tract signs, or neurologic sphincter disturbance (*id.*). With regard to his knee, he denied any swelling, pseudolocking, or instability (*id.*).

On physical examination, Dr. Koulisis observed that Plaintiff arose without difficulty and upon standing, had normal cervical lordosis, thoracic kyphosis, and lumber lordosis (Tr. 274). Plaintiff's gait was normal, and he was able to heel/toe and tandem walk without difficulty (*id.*). Examination of the shoulders revealed normal range of motion, both passively and actively, and a well-healed incision on the left shoulder (*id.*). Plaintiff had a negative sulcus signs, negative impingement signs, negative provocative testing confined to the supraspinatus, and negative apprehension signs (*id.*). Examination of the elbows, wrists, and hands was unremarkable (*id.*). Range of motion of the thoracolumbar spine was normal, motor strength was 5/5, and reflexes were 2+ and equal (*id.*). Sensation was intact, and there were negative tension signs, both sitting and lying, bilaterally (*id.*). Examination of the knees revealed no effusion; normal patellofemoral mechanics throughout the range of motion, bilaterally; and negative "Apley's grind and McMurray's" (Tr. 275). Plaintiff's knees were stable to all stresses, while flexion was limited to 130 degrees (Tr. 275-76).

Dr. Koulisis' assessment was left shoulder status post glenoid labrum repair and rotator cuff repair, secondary to an industrial accident in December 1997 (*id.*). Dr. Koulisis opined that Plaintiff

had an excellent surgical result (*id.*). He also assessed Plaintiff with complaints of neck, back, and left knee pain, but stated that the examination was unremarkable in those areas (*id.*). It was his opinion that no further diagnostic or treatment modality was indicated, other than a self-directed exercise program related to Plaintiff's shoulder (*id.*).

With regard to Plaintiff's physical capacities, Dr. Koulisis opined that Plaintiff's lifting ability would be limited to no more than twenty pounds with the left upper extremity, both on an "occasional" and "frequent" basis (Tr. 277). He indicated that Plaintiff's standing, walking, and sitting were not affected by his impairment (Tr. 277-78). With regard to pushing and/or pulling, Dr. Koulisis limited Plaintiff to no prolonged overhead activity with the left upper extremity (Tr. 278). It was his opinion that Plaintiff could occasionally climb and frequently balance, kneel, crouch, crawl, and stoop (*id.*). He further opined that Plaintiff had unlimited manipulative abilities (Tr. 279).

On July 7, 2004, Dr. Witkind, a neurosurgeon and medical expert, testified at Plaintiff's supplemental hearing before the ALJ (Tr. 344-50). He testified that he had reviewed Plaintiff's medical records, and he noted that Plaintiff's primary physical problem was the injury to his left shoulder (Tr. 345). He concurred with Dr. Todd's impairment rating of 4 percent during the time frame relevant to Plaintiff's claim, and he opined that Plaintiff's injury did not meet or equal a listed musculoskeletal impairment (Tr. 346). In support, Dr. Witkind referred to Plaintiff's post-operative state (i.e., "status-post left shoulder repair"), with normal neurological examination, as well as Dr. Koulisis's normal post-operative examination (Tr. 347). Dr. Witkind also noted that Plaintiff was right-handed and the injury was to his left shoulder (Tr. 349).

Plaintiff's counsel contacted Dr. Javellana by letter dated August 9, 2004, in an attempt to ascertain what a GAF rating of 50-55, assessed in connection with her evaluation of Plaintiff on March 29, 2002, indicated with regard to the seriousness of Plaintiff's symptomatology (Tr. 324-25). In her letter to Dr. Javellana, counsel stated that "it would seem to me that a Global Assessment of Functioning of 50 to 55 would be in the moderately serious range of symptoms" (Tr. 324). In a statement provided on August 27, 2004, Dr. Javellana advised that based on the aforementioned evaluation and as defined in the Global assessment of Functioning Scale contained in the Diagnostic and Statistical Manual-IV, it was her opinion that Plaintiff's symptoms were "moderately serious" (Tr. 326).

V.    DISCUSSION

Plaintiff raises four issues on appeal (Doc. 7 at 12-23).  Plaintiff contends that the ALJ erred in failing to: 1) assign controlling weight to the opinions of Plaintiff's treating physicians and therapists, 2) apply the Eleventh Circuit's three-part pain standard, 3) rely on a response from the VE to a hypothetical question, and 4) give any weight to the VA's finding that Plaintiff was totally and permanently disabled.

1.    Treating Physicians

Plaintiff contends that the ALJ erred in discounting the opinions of Maxine Marretta, A.R.N.P., and Clifford Harris, M.S.W.; erred in concluding that there was no probative evidence to show that Plaintiff's symptomology persisted at a sufficient severity on a continuous basis; and erred in rejecting Dr. Javellana's opinion regarding Plaintiff's GAF (*id.*).

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* Lewis v. Callahan, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991);  Sabo v. Commissioner of Social Security,  955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527 (d).  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (citation omitted).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* Edwards, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See* Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* Schnor v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).

If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not

inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527 (d)(2).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527 (d).  Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion.  *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527 (e).   The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are the providence of the Commissioner.  20 C.F.R. § 404.1527 (e).

Plaintiff first contends the ALJ erred "when he failed to assign controlling weight [to] the opinions of Plaintiff's treating physicians and therapists" (Doc. 7 at 12).  More specifically, Plaintiff contends that the ALJ should have given some weight to the opinions of Maxine Marretta, A.R.N.P., and Clifford Harris, M.S.W. (Doc. 7 at 14).

Regarding the opinions of Ms. Marretta, the ALJ summarized her documentation in great detail, including her opinion that Plaintiff's GAF was 50  (Tr. 25-26, 40-41).  The ALJ later stated that consideration had been given to her opinion, but because she was not an acceptable medical source as defined in the regulations, her opinion could not be given substantial weight (Tr. 41).[7] *See*

---

[7]It appears from his reference to 20 C.F.R. § 404.1527(d) that the ALJ is using the terms "substantial" and "controlling" interchangeably.

20 C.F.R. § 404.1513 (a nurse practitioner is not an acceptable medical source); *see also* Falge v. Apfel, 150 F.3d 1320, 1324 (11th Cir. 1998) (an ALJ is permitted to accord less weight to chiropractors and other nonmedical doctors than to medical doctors).  Thus, the ALJ did not err in failing to assign controlling weight to the opinions of Ms. Maretta.  To the extent Plaintiff argues that the ALJ should have given Ms. Marretta's opinion "some" weight, this court finds that the ALJ did accord some weight to her opinion, as evidenced by the ALJ's detailed  summary of her records and his statement that he considered her opinion but declined to give it substantial weight.

The same conclusion could easily be reached with regard to the ALJ's discounting of Mr. Harris' opinions, as he is not an "acceptable medical source," but the court notes that the records from Mr. Harris pertain to another patient (*see* bottom left of transcript, pages 285 through 297, reflecting the name and date of birth of someone other than Plaintiff).  Although the ALJ erroneously included information from these records in his opinion (Tr. 28-30, 42-43), as did counsel for both parties in their respective memoranda (*see* Doc. 7 at 14; Doc. 8 at 4-5), the information is irrelevant and should not be considered in relation to Plaintiff's claim.  The court notes, however, that the inclusion of this patient's records in Plaintiff's file has not prejudiced Plaintiff in any way; indeed, the other patient appears to have more serious mental impairments than Plaintiff, including schizophrenia.

Plaintiff next asserts the ALJ erred in concluding that there was no probative evidence to show that Plaintiff's mental symptomology persisted at a sufficient severity on a continuous basis (Doc. 7 at 14-15).  Initially, the court notes that Plaintiff relied on records pertaining to another patient in support of the arguement that Plaintiff's symptoms persisted for more than twelve months (*id.* at 14).  Additionally, the ALJ correctly noted that Plaintiff did not raise any allegations regarding mental impairments until his August 23, 2001 visit to the VA clinic, when he complained of feeling fatigued and depressed for four to six months, with intermittent periods of feeling "extra good" and energetic for a week at a time (Tr. 40).  The ALJ also noted that Plaintiff was referred to the mental health clinic and seen by a nurse practitioner, who assessed Plaintiff with depression and prescribed Celexa and Trazodone (Tr. 41).  The ALJ noted that in October 2001 Plaintiff reported that he could not tell much difference on the medication, but he also stated he was going out more with friends, isolating less, and not sleeping as much (*id.*).  The ALJ observed that Plaintiff's Celexa

was increased, and that although the records indicate Plaintiff was to return to the clinic at the end of December 2001, there is no evidence the appointment was kept (*id.*).  The ALJ pointed out that because Plaintiff did not keep his appointment, he most likely had responded appropriately to the increase in  medication (Tr. 42).

The ALJ also noted that there is no evidence that Plaintiff complained of depressive symptoms at his February 2002 appointment with Dr. Foscue, and Dr. Foscue did not document that Plaintiff exhibited any depressive symptoms (Tr. 42, 222-23).  Moreover, the ALJ noted that there is no evidence that Plaintiff was examined by a psychiatrist or psychologist until March 29, 2002 (prior to that he had only been seen by a nurse practitioner) (Tr. 41).  When Plaintiff did see Dr. Javellana, M.D., in March 2002, he contended that his medications did not work (Tr. 42).  However, he admitted to only taking them "on and off" (*id.*).  The ALJ further noted that Plaintiff appeared to be exaggerating when he reported to Dr. Javellana that he had problems with appetite and had lost weight, because treatment records show he had lost only four pounds since August 2001, and this loss followed a weight gain of twenty-two pounds (*id.; see also* Tr. 222 (reflecting Plaintiff's weight as 163 in February 2002), Tr. 226 (reflecting Plaintiff's weight as 167 in August 2001), Tr. 230 (reflecting Plaintiff's weight as 145 in July 2000)).  Accordingly, the ALJ did not err in concluding that there was no probative evidence to show that Plaintiff's mental symptomology persisted at a sufficient severity on a continuous basis.

Additionally, the court notes that a claimant's failure to seek treatment is a proper factor for the ALJ to consider, *see* Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984) (in addition to objective medical evidence, it is proper for ALJ to consider use of painkillers, failure to seek treatment, daily activities, conflicting statements, and demeanor at the hearing), and an absence of treatment indicates that a mental impairment is non-severe, *see, e.g.*, Williams v. Sullivan, 960 F.2d 86, 89 (8th Cir. 1992).

Plaintiff also asserts that the ALJ erred in rejecting Dr. Javellana's opinion regarding Plaintiff's GAF (Doc. 7 at 15-17).  Dr. Javellana evaluated Plaintiff once, on March 29, 2002 (Tr. 305).  At that time she assessed Plaintiff with a GAF in the range of 50-55 (Tr. 307).  As noted in footnotes four and six, *supra*, a GAF of 41 to 50 indicates "serious" symptoms or impairment in social, occupational, or school functioning, while a score of 51 to 60 indicates only moderate

symptoms.  Two years and four months after Dr. Javellana evaluated Plaintiff, she was asked to clarify her earlier GAF assessment (Tr. 324-26).  She clarified the assessment by stating that Plaintiff's symptoms are "moderately serious" (Tr. 326).  The ALJ declined to assign "determinative weight" to her opinion, noting that it did not prove that Plaintiff's symptomatology lasted for any twelve consecutive months during the period under adjudication, it was given more than two years after her evaluation, it was "clearly prompted by the explicit opinions given by [Plaintiff's] counsel," and it was contained on a checklist of three choices "without opportunity for narration or explanation" (Tr. 41).

Although the court does not necessarily agree with the ALJ's opinion that Dr. Javellana's opinion was "clearly prompted" by Plaintiff's counsel, the court finds that the ALJ's other reasons are well supported by the record.  First, Dr. Javellana's opinion does not establish that Plaintiff's symptomatology lasted for any twelve consecutive months during the relevant time frame, November 30, 2000 to March 31, 2002.  As previously discussed, Plaintiff first reported mental problems in on August 23, 2001, and returned for two follow up appointments in August and October 2001.  He then missed a scheduled appointment in December 2001 and sought no further treatment until he reported "bouts of depression" in October 2003 (Tr. 308). Additionally, Plaintiff's evaluation with Dr. Javellana in March 2002, was in connection with his application for VA benefits, not for treatment.  Second, Dr. Javellana's opinion was provided more than two years after she evaluated Plaintiff.  Even Plaintiff's counsel, in her letter to Dr. Javellana, acknowledged that she (Dr. Javellana) might "not remember [Plaintiff] specifically" (Tr. 324).  Moreover, this court does not find that Dr. Javellana's opinion in 2004 clarifies much, if anything.  What is undisputed is that her earlier opinion, for the most part, assessed only moderate symptoms, because the scores she provided fell almost entirely in the "moderate symptoms" range of the GAF scale.  Furthermore, Dr. Javellana's opinion was conclusory, in that it was contained on a checklist that provided only three choices, it contained no area for further explanatory comments and none were provided, and the opinion contains no citation to any medical evidence to support the selected answer.  Finally, as a one-time consultative examiner, Dr. Javellana's opinions are not entitled to deference.  *See* McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987) (citing Gibson v. Heckler, 779 F.2d 619, 623

(11th Cir. 1986)).  Thus, this court finds that the ALJ did not err in failing to assign determinative weight to Dr. Javellana's opinion that Plaintiff's mental impairments were "moderately serious."

> 2.      The Eleventh Circuit Pain Standard

Plaintiff contends that the ALJ "committed reversible error when he failed to apply this Circuit's three-part pain standard before discrediting [Plaintiff's] subjective complaints of pain and other symptoms" (Doc. 7 at 17).

Pain is treated by the Regulations as a symptom of disability.  Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms." *Accord* 20 C.F.R. § 416.929.  In Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

The Eleventh Circuit continues to follow the Hand test.  Wilson v. Barnhart, 284 F.3d 1219 (11th Cir. 2002); Kelley v. Apfel, 173 F.3d 814 (11th Cir. 1999); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Martin v. Railroad Retirement Bd., 935 F.2d 230, 233 (11th Cir. 1991).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard."  Wilson, *supra*, 284 F.3d at 1226.  Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself."  Elam, 921 F.2d at 1216.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence."  Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (citing Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987)).

However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered.  *Id.*; Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[I]f the Commissioner refuses to credit [subjective testimony of the plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true."  MacGregor v. Bowen, 786 F.2d at 1054; Holt v. Sullivan, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole."  Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted).  The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints of pain.  Those complaints are, after all, subjective.  "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain."  Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[8]  People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others.  "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ."  Hand, *supra,* at 1548-49.  It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence."  Arnold v. Heckler, 732 F.2d 881, 884  (11th Cir. 1984).  Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.  The evidence as

---

[8]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

Initially, Plaintiff contends "there is no indication whatsoever that the ALJ applied [the Eleventh Circuit's] pain standard" (Doc. 7 at 18).  Although the ALJ did not specifically cite to the pain standard in his opinion,[9] this does not constitute reversible error as long as the ALJ applied the appropriate regulation.

The ALJ found that Plaintiff had evidence of an underlying medical condition, as he found that Plaintiff's status post repair of his left shoulder was a severe impairment (*see, e.g.*, Tr. 47).  However, the ALJ noted that the objective medical evidence did not support Plaintiff's allegations of disability (Tr. 39-41), stating specifically that "there existed a vast disparity between the objectively demonstrative medical evidence and the alleged severity and frequency of [Plaintiff's] reported symptoms" (Tr. 39).  Moreover, the ALJ stated that he determined that Plaintiff possessed no severe impairments from which limitations as serious as those alleged by Plaintiff "could reasonably have been expected to emanate" (Tr. 44).  The ALJ's statements demonstrate that he applied the correct standard.  *See* Hand, 761 F.2d at 1549 (11th Cir. 1986).

As to the substance of the ALJ's pain analysis, the court first notes that despite Plaintiff's complaints of left shoulder pain, an MRI performed on August 28, 2000 showed only a minor abnormality (Tr. 240).  Also, as noted by the ALJ, Dr. Koulisis observed that Plaintiff had an "excellent" surgical result and opined that no further diagnostic or treatment modality was indicated, other than an exercise program (Tr. 40, 275).  Additionally, even after Plaintiff's DLI, Dr. Koulisis noted that he had full range of motion in his shoulders (Tr. 274).  Moreover, as noted by the ALJ, the physician opinions regarding Plaintiff's physical abilities were inconsistent with his allegations of disability, but consistent with the ALJ's determination that Plaintiff was capable of performing

---

[9]The ALJ did specifically note that if he "fails to articulate reasons for refusing to credit the claimant's subjective pain and other symptomatology testimony, the [ALJ] has, as a matter of law, accepted that testimony as true (*See* Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987)." (Tr. 38).

a wide range of light work (*see* Tr. 40, 47).[10] Dr. Koulisis found that Plaintiff was capable of performing activities consistent with light work activity (Tr. 277-80); the medical expert, Dr. Witkind, also testified that Plaintiff could perform activities consistent with a range of light work (*see* Tr. 349); and Dr. Seay and Dr. Peele each found that Plaintiff was capable of performing light work with restrictions limiting the use of his left arm (*see* Tr. 212-219, 245-52).   Dr. Witkind, concurring with Dr. Todd, assessed only a 4 percent impairment rating as a whole, and Dr. Witkind further opined that this impairment rating existed during the time frame under adjudication (Tr. 40). Furthermore, the ALJ noted that Plaintiff's Compensation and Pension examination in April 2002 resulted in findings that Plaintiff's shoulder showed flexion to extension to 180 degrees on range of motion testing, that Plaintiff had good abduction to 180 degrees, and impingement sign was negative (Tr. 39, 302-07).

The ALJ also noted that Plaintiff sought infrequent medical care for his alleged impairments (Tr. 39-43).  For example, Plaintiff did not seek treatment for his shoulder problems from September 1999 through May 2000[11] (Tr. 39).  The ALJ then noted another gap in treatment from July 2000 through August 2001, but the ALJ pointed out that when Plaintiff presented for treatment in August 2001, he did not specifically complain about problems with his shoulder, he was there because he was having problems with his throat (Tr. 39).  Plaintiff had another gap in treatment between August 2001 and February 2002 (Tr. 39).  A claimant's failure to seek treatment is a proper factor for the ALJ to consider.  Watson, 738 F.2d at 1173.   Moreover, the ALJ pointed out that in July 2000, Plaintiff rated his shoulder pain at a four (Tr. 39, 229).  Additionally, at his February 2002

---

[10] Light work is defined in 20 C.F.R. §§ 404.1567(b) as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

[11] The ALJ stated that Plaintiff sought no treatment between August 1999 and May 11, 2000, but the record reflects that Plaintiff saw Dr. Todd on September 19, 1999 (*see* Tr. 198); thus, the gap was actually between September 1999 and May 2000.

examination, Plaintiff reported that his shoulder did not really concern him at that time (Tr. 39, 222). Although Plaintiff was evaluated in April 2002 in connection with his Compensation and Pension claim, the ALJ found that there is no evidence that Plaintiff subsequently sought or received treatment specifically related to his shoulder (Tr. 40).

As to Plaintiff's mental disorders, the ALJ noted Dr. Moreland's findings that Plaintiff's mental impairments did not significantly affect his ability to understand, remember, and carry out instructions or affect his ability to respond appropriately to supervision, co-workers, and work pressures (Tr. 43, 271-72).  Additionally, although Plaintiff alleged that medications for his mental disorders had not been effective, he admitted that he was not taking them on a consistent basis (Tr. 42, 328).  The ALJ properly considered that Plaintiff did not take his medications as prescribed in evaluating his credibility.  *See* Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) ("[T]he ALJ's consideration of Ellison's noncompliance as a factor in discrediting Ellison's allegations of disability is adequately supported . . . ."); *see also* Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir.1988) (refusal to follow prescribed medical treatment without a good reason will preclude a finding of disability).  Moreover, as noted by the ALJ and discussed *supra*, Plaintiff never sought treatment for any mental disorder prior to August 2001, and his follow-up treatment was limited (Tr. 40-41).

Accordingly, this court concludes that the ALJ applied the correct pain standard and did not err in finding that Plaintiff's subjective allegations were not fully credible.  The ALJ articulated specific reasons for discounting Plaintiff's allegations, and substantial evidence in the record as a whole supports his findings.

3.      Hypothetical Question

Plaintiff next contends that the ALJ's questioning of the VE was improper because he failed to include certain mental limitations (Doc. 7 at 20-22).

A hypothetical question must comprehensively describe the plaintiff's condition, and vocational expert testimony that does not accurately address that condition cannot be considered substantial record evidence.  Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).  However, the ALJ is not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported.  *See* McSwain v. Bowen, 814 F.2d 617, 620 n.2 (11th Cir. 1987).

In the instant case, the ALJ's questions were premised upon the RFC he determined for Plaintiff. Initially the ALJ asked the VE to consider a person with Plaintiff's vocational background that had no restrictions in his ability to sit, stand, or walk; no restrictions involving his right upper extremity; no bilateral extremity lifting greater than twenty pounds, but unlimited right extremity lifting; no prolonged overhead pushing or pulling with his left extremity; occasional climbing; and frequent balancing, kneeling, crouching, crawling, and stooping (Tr. 355-57). In response, the VE opined that Plaintiff could return to his past relevant work as a porter in an auto body shop and as a food deliverer (Tr. 358-59). Additionally, Plaintiff would be capable of performing work as a stacking machine operator, tool grinder, inspector and tester, garment sorter, fast food worker, route delivery clerk, assembler, and food checker (Tr. 359-60). The ALJ then asked the VE to consider additional limitations restricting repetitive overhead lifting, repetitive pushing and pulling, and lifting greater than fifteen pounds (Tr. 360-61). The VE indicated that those restrictions would eliminate the auto body porter and tool grinder jobs, but would not eliminate the food delivery job (Tr. 361). The VE stated that the stacking machine operator job might be affected, but the garment sorter, fast food worker, delivery clerk, and inspector and tester jobs would not be affected, nor would sedentary occupations be eliminated (Tr. 361). Finally, the ALJ asked the VE whether a person limited to unskilled work, due to the effects of any mental or emotional conditions, could perform the work previously identified by the VE (Tr. 362). The VE responded that such a limitation would exclude virtually any semi-skilled or skilled occupations, but the jobs of food delivery worker, assembler, food checker, garment sorter, and fast food worker would remain (*id.*). Finally, when Plaintiff's counsel asked the VE to factor in a GAF of 50 to 55, and explained to the VE that such a score reflects "moderately severe to severe psychiatric limitations in terms of doing daily activities and react and associate appropriately with coworkers, as well as supervisors. And moderately severe to severe level at [sic] difficulty in dealing with regular work stressors," the VE then indicated that "such an individual could not sustain any of the jobs" previously indicated, nor could the individual work elsewhere unless it was in a "highly sheltered setting" (Tr. 364-65).

The ALJ was not required to rely on the VE's responses to the questions posed by Plaintiff's counsel, as her questions included limitations that the ALJ had properly rejected as unsupported by the record. The ALJ properly discounted Dr. Javellana's opinion that Plaintiff had "moderately

serious" symptoms, as discussed *supra*, as well as the nurse practitioner's assessment of a GAF of 50. Nevertheless, the ALJ did consider that Plaintiff has some mental limitations, and he incorporated that consideration into his questioning. The ALJ's final question asked the VE to consider a person limited to unskilled work, <u>due to the effects of any mental or emotional conditions</u>, and the VE recited several available jobs Plaintiff could perform.

> Unskilled work is defined in the regulations as follows:

> [W]ork which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs.

20 C.F.R. § 404.1568(a).

Ultimately, the ALJ found that Plaintiff was capable of performing <u>at least</u> unskilled work (*see* Tr. 44 (emphasis added)). This finding takes into consideration that Plaintiff suffers from some mental or emotional condition, but not a severe psychiatric condition as suggested by Plaintiff's counsel. The ALJ's finding has substantial support in the record, including Plaintiff's lack of significant mental health treatment and Dr. Moreland's conclusion that Plaintiff's mental impairments did not significantly affect his ability to understand, remember, and carry out instructions or affect his ability to respond appropriately to supervision, co-workers, and work pressures (Tr. 271-72). Thus, the ALJ's RFC determination is supported by substantial evidence, and his hypothetical questions that included the limitations he found credible, and excluded those he properly discounted, were not improper.

4.      Veteran's Administration Rating

Finally, Plaintiff contends that the ALJ "failed to give any weight to the finding of the VA [on April 23, 2002] that Plaintiff was totally and permanently disabled" (Doc. 7 at 22). Although the ALJ considered the VA's conclusion, he rejected it, stating that it "clearly applied different standards and has a much more limited record from which to reach conclusions" (Tr. 42).

The VA's disability rating is not binding on the Commissioner, but it is evidence that should be given great weight. *See* Brady v. Heckler, 724 F.2d 914, 921 (11th Cir. 1984) (adopting the Fifth Circuit's findings in Olson v. Schweiker, 663 F.2d 593, 597 n.4 (5th Cir. 1981) and Rodriguez v. Schweiker, 640 F.2d 682, 686 (5th Cir. 1981)).

In the instant case, the ALJ recognized his duty to accord weight to the rating decision of the VA "pursuant to this Court's decision in Falcon" (Tr. 42). *See* Falcon v. Heckler, 732 F.2d 827, 831 (11th Cir. 1984) (stating that the findings of another agency are entitled to great weight). However, the ALJ declined to adopt the VA's decision, noting that it was not binding on the Commissioner, pursuant to 20 C.F.R. § 404.1504, and that it was based, in large part, on Dr. Javellana's opinions and a much more limited record (Tr. 42; *see also* Tr. 281-82). Dr. Javellana's opinion was properly discounted by the ALJ, and the ALJ indeed considered a far more complete record than the VA, including the opinions of Dr. Witkind, Dr. Moreland, Dr. Koulisis, Dr. Seay, Dr. Peele, and the VE that Plaintiff could perform activities consistent with the ability to work.[12] Thus, the ALJ properly considered the VA's decision, and he rejected it for reasons that have substantial support in the record.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

---

[12]Although the opinions of Dr. Seay and Peele were rendered prior to the VA's decision, there is no evidence suggesting that the VA reviewed their RFC assessments. Indeed, the VA's decision includes a statement that the decision is based upon outpatient records from the VA from August 23, 2001 through February 22, 2002, including the nurse practitioner's assessment of a GAF of 50 and the opinions of Dr. Javellana (Tr. 281).

At Pensacola, Florida this <u>30</u><sup>th</sup> day of August 2006.


<u>/s/ Elizabeth M. Timothy</u>
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

        Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).